IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

AMERITITLE INC., an Oregon Corporation,

        Plaintiff,

     v.

GILLIAM COUNTY and PATRICIA SHAW, in her
official capacity as Gilliam County Judge,

        Defendants.

CV 09-318-SU

FINDINGS AND
RECOMMENDATION

SULLIVAN, Magistrate Judge:

1 - FINDINGS AND RECOMMENDATION

*Findings and Recommendation*

AmeriTitle Inc. ("AmeriTitle"), an Oregon corporation in the business of performing title work, filed a First Amended Complaint ("FAC") against Gilliam County and Patricia Shaw, in her official capacity as Gilliam County Judge (collectively "County"). AmeriTitle alleges claims pursuant to 42 U.S.C. § 1983 for violations of the Equal Protection Clause and the Commerce Clause of the United States Constitution, and a state law claim for intentional interference with prospective business relations.[1] AmeriTitle also seeks declaratory, injunctive and monetary relief.

In its FAC, AmeriTitle challenges an alleged "Local Business Policy" requiring wind farm companies seeking tax abatement through a Strategic Investment Program ("SIP") agreement to favor County businesses over similarly situated businesses located outside of the County. (First Am. Compl. ¶¶ 1-2.) Also at issue in this lawsuit is a specific provision in a SIP agreement between Pebble Springs Wind, LLC ("Pebble Springs LLC"), and the County regarding the mandatory bidding requirements for local contractors ("Local Contractor Requirement") selected to work on the Pebble Springs LLC's project. (First Am. Compl. ¶ 3.) According to the FAC, the Local Contractor Requirement in the Pebble Springs LLC SIP agreement reflects the County's Local Business Policy requiring all wind development companies to employ Gilliam County contractors for projects within the County. The SIP agreement between the County and Pebble Springs LLC was entered into on October 1, 2008, after both parties to the contract provided public information about

_____

[1]Specifically, AmeriTitle alleges in its FAC: (1) denial of equal protection under the law in violation of the Fourteenth Amendment (First Claim for Relief); (2) a Commerce Clause violation (Second Claim for Relief); and (3) intentional interference with economic relations (Third Claim for Relief). Finally, in its Fourth Claim for Relief, AmeriTitle seeks a declaratory ruling that both the Local Contractor Requirement and the Local Business Policy are unenforceable facially and as applied.

the SIP program and Pebble Springs LLC's application for the SIP agreement, and after a formal public hearing on the SIP agreement.

The parties filed cross-motions for summary judgment. AmeriTitle requests the court enter a partial summary judgment on its claims for declaratory relief and a single element of it claim for interference with economic relations. AmeriTitle also seeks to strike certain evidence submitted by the County. Conversely, the County seeks summary judgment against all claims set forth in AmeriTitle's FAC. Oral argument was heard and for the reasons set forth below, AmeriTitle's motion for partial summary judgment should be denied; and, the County's motion for summary judgment should be granted, in part, and denied, in part. AmeriTitle's evidentiary objections are denied.

*Factual Background*

Gilliam Title Company ("GCT") is a title company located in Condon, Oregon and is owned by Hollie Winslow. (Holly Winslow Decl. ¶ 1, July 22, 2010.) Winslow began working for GCT in 1989, and she purchased GCT in 1998. (Winslow Decl. ¶ 1.) GCT maintains a title plant (a comprehensive collection of recorded documents) for the County, as required by Oregon statute, and has done so for over forty years. (Winslow Decl. ¶ 3.) Winslow and her employees perform title searches and issue reports. (Winslow Decl. ¶ 2.) First American Title Insurance ("First American") underwrites all of the title insurance policies for GCT's clients. (Winslow Decl. ¶ 5.) Before AmeriTitle opened its title plant for Gilliam County, GCT was the only title company with a title plant for the County. In fact, GCT performed all title searches and reports for First American in the County prior to August 1, 2008. (Winslow Decl. ¶¶ 4,6.)

3 - FINDINGS AND RECOMMENDATION

AmeriTitle, a subsidiary of Jeld-Wen, is a title company with offices in Oregon and Washington.  (Craig Trummel Dep. 8:12-9:7, 33:1-9, Sept. 16, 2009.)  Craig Trummel was the General Manager of AmeriTitle's office in The Dalles, Oregon, at the time of the events in dispute. (Trummel Dep. 8:13-9:6.)  Unlike GCT, AmeriTitle works with various underwriters who provide title insurance for its clients.  (Trummel Dep. 35:17-36:4.)  AmeriTitle does not have an office in Gilliam County and it did not have a title plant for the County until August 1, 2008.  (Trummel 22:15-17, 27:12-16; Richard J. Kuhn Decl. Ex. F, July 23, 2010.)

Pebble Springs LLC is a subsidiary of Iberdrola Renewables, Inc. ("Iberdrola"), which was formerly known as PPM Energy, Inc.[2]  (Jesse Gronner Dep. 42:1-5, Jan. 13, 2010; Kuhn Decl. Ex. E, Ex. L at 1;Winslow Decl.¶ 19.)

GCT began doing title work for wind companies in the early 2000s.  (Hollie Winslow Dep. 14:4-12, Jan. 5, 2010.)  In January 2005, GCT began performing title work for a wind project Iberdrola  wanted to build in Gilliam County.  (Winslow Decl. ¶ 7.)  The Iberdrola wind farm project[3] consisted of three facilities to be located on three separate pieces of property, known as Leaning Juniper I ("Juniper I"), Leaning Juniper II ("Juniper II") and Pebble Springs ("Pebble Springs Farm")[4].  (Winslow Decl. ¶ 7.)  Juniper II was divided into phases A and B, and are located on  properties  owned by multiple parties.  (Winslow Decl. ¶ 7.)  The Pebble Springs Farm and Juniper I are both located on properties owned by one party.  (Winslow Decl. ¶ 7.)

---

[2]All references are to Iberdrola.

[3] Pebble Springs LLC, a subsidiary of Iberdrola, is the entity that builds and operates the wind farm projects within the County.  (Kuhn Decl. Ex. G.)

[4] Entitled "Pebble Springs Farm" for purposes of distinguishing from Pebble Springs LLC.

4 - FINDINGS AND RECOMMENDATION

GCT performed the title work on all three of these locations with the understanding it would not be paid until the title policy was issued for each of the projects, which is the custom in the industry. (Winslow Decl. ¶ 8; Trummel Dep. 51:5-52:2; Robert Sargeant Dep. 4:24-6:3, 75:21-76:13, Jan. 18, 2010.) AmeriTitle has also worked on projects for Iberdrola and has never been paid until the policy issues. (Trummel Dep. 89:1-4, 105:2-5.)

Title companies are generally paid a percentage of the premium for the title insurance policy, according to the arrangement with their underwriter. (Winslow Decl. ¶ 9; Trummel Dep. 36: 5-14.) Preparation of a preliminary report is paid for as part of the premium for the policy. (Winslow Dep. 29:15-20.) Typically, the title policy is issued when the project is completed. (Winslow Dep. 39: 21-24.) The wind company determines when a title policy will be issued. (Winslow Dep. 39:21-40:3.) GCT never charges an hourly rate for work and it never billed Iberdrola on a task basis. (Winslow Dep. 42:8-10, 89:20-21.) Typically, GCT does not bill for work on wind projects. Rather, the billing is handled by National Commercial Services ("NCS"), which is a division of First American. (Winslow Dep.17:11-25, 25:9-14.) NCS also issues the title policies for wind farm companies. (Winslow Dep. 40:13-16.) Winslow testified she has never had a situation where the title policy did not issue and she did not get paid. (Winslow Dep. 42:11-13.)

GCT has performed all of the title work for Iberdrola (in Gilliam County) with the understanding that Iberdrola is GCT's client. No representative of Iberdrola has ever suggested to Winslow that Iberdrola wished the work to be performed by another title company. Winslow has never known a client to switch to another title company after ordering reports on a project from GCT over a period of time. (Winslow Decl. ¶ 29.)

5 - FINDINGS AND RECOMMENDATION

In February 2005, GCT issued its first report on Juniper I. (Winslow Decl. ¶ 11.) The next month, GCT issued a report on a portion of the Juniper II A property. (Winslow Dec. ¶ 12). In September 2005, GCT issued a preliminary title report on the Pebble Springs Farm property and on an additional portion of the Juniper II A property. (Winslow Decl. ¶ 12.) In December 2005, GCT issued its first report on the Juniper II B property. (Winslow ¶ 13.). The following April and July 2006, First American issued policies of title insurance on the Juniper I property, and GCT was paid for its work related to that property from the title policy premiums. (Winslow ¶ 14.)

GCT completed its title work on the Pebble Springs Farm property in May 2006, except for ongoing updates, and continued to issue reports on the various Juniper II A and B properties throughout 2006, 2007 and 2008. (Winslow Decl. ¶ 15.) GCT updates its reports periodically until a policy of title insurance issues. (Winslow Decl. ¶ 15.) In September 2008, GTC began doing work on the Leaning Juniper III or Montague project ("Juniper III") for Iberdrola. (Winslow Decl. ¶ 26; Gronner Dep. 44:14-20.) At the time Winslow's declaration was filed in July 2010, approximately 95 percent of the title work on Juniper III had been completed. (Winslow Decl. ¶ 26.)

In October 2007, Iberdrola approached the County seeking a SIP agreement so it could receive a tax break for its wind project. (Patricia Shaw Dep. 60:11-18, Aug. 27, 2009; Michael W. Weimar Dep. 20:3-8, Aug. 26, 2009.) Despite reducing tax benefits to the County, a SIP agreement contributes to the economic development within the County. (Shaw Dep. 112:8-10.)

By August 1, 2008, AmeriTitle had created a title plant for Gilliam County and began providing title services for the County from its office in The Dalles. (Kuhn Decl. Ex. F.) Prior to completing its title plant for Gilliam County, AmeriTitle could not legally perform any work on the Iberdrola projects at issue in this case. (Trummel Dep. 75:11-76:4.)

6 - FINDINGS AND RECOMMENDATION

Gilliam County is governed by a three-member County Court, comprised of the County Judge and two Commissioners. (Shaw Dep. 93:8-22; Kuhn Ex. H.) Shaw is the County Judge, Chair of the County Court and Chief Administrative Officer for the County. (Shaw Dep. 5:11-6:8.) On October 1, 2008, Pebble Springs LLC and Gilliam County entered into a SIP agreement, covering Pebble Springs Farm, Juniper II and Juniper III. (Kuhn Decl. Ex. G at 2.) The County's negotiating team was comprised of Will Carey, legal counsel, Paul Woodin, wind consultant, Shaw and Leanne Durfey, Shaw's assistant. (Shaw Dep. 18:12-21, 48:14-24.) The SIP agreement was approved by the County Court at a public meeting on October 1, 2008, and was signed by Shaw and Commissioners Michael Wiemar and Frank Bettencourt for the County.[5] (Kuhn Decl. Ex. G at 12; Shaw Dep. 125:20-126:12.)

The SIP agreement recited that Pebble Springs LLC proposed to build and operate within the County a commercial wind energy generation project which was expected to include wind turbine generators, machinery and equipment, roads, substation(s), meteorological towers and an operations and maintenance facility. (Kuhn Decl. Ex. G at 1.)

The SIP agreement, which expressly sets forth the scope of the project, also includes a paragraph related to the selection of contractors, referred to by AmeriTitle as the "Local Contractor Requirement." (Kuhn Decl. Ex. G at 2, 6.) The parties do not dispute that the specific language of the Local Contractor Requirement was included at the request of Jesse Gronner, Iberdrola's Director of Business Development, who negotiated the SIP agreement on behalf of Iberdrola. (Shaw Dep. 26:23-25; Kuhn Decl. Ex. I, J, K; Wilford K. Carey Dep. 38:19-24, Nov. 23, 2009.) AmeriTitle contends, however, that Iberdrola proposed this term only "to provide delineation regarding Gilliam

---

[5] Commissioners Wiemar and Bettencourt are not named as parties in the FAC.

County's policy of requiring wind farm companies to use Gilliam County businesses. . . ." (Pl.'s Resp. Concise Stat. Facts. ¶ 1.) In sum, the language for the Local Contractor Requirement in the Pebble Springs LLC SIP agreement resulted from Iberdrola's attempt to protect itself from the County's policy requiring the use of local businesses. (Woodin Dep. 65:6-25; Gronner Dep. 51:5-19.)

The Local Contractor Requirement provided: "In the event the County Commission feels a local contractor was not selected, but should have been, then IBERDROLA LLC and the County will meet to seek to resolve the issue." (Kuhn Decl. Ex. G at 6.) No such meeting was ever held. (Gronner Dep. 120:4-18.) AmeriTitle does not appear to dispute the County's assertion that the Local Contractor Requirement is not included in any other Gilliam County SIP agreement. (Shaw Dep. 27:16-17; Carey Dep. 138:4-24.) The parties dispute whether the County has a policy requiring the use of local contractors.

As of October 1, 2008, the date the SIP agreement was signed, GCT had issued 15 reports on the various properties incorporated in the project, and the title work on the project was approximately 75 percent complete. (Winslow Decl. ¶ 16.) After October 1, 2008, GCT continued to issue reports on the Juniper II properties, as requested by Iberdrola and First American. (Winslow Decl. ¶ 17.) In September 2008, GTC began doing title work for Iberdrola on Juniper III. (Winslow Decl. ¶ 26.) In January 2010, Juniper III was in a development stage, i.e., no permit had been issued by the state, but the project was covered by the SIP agreement with the County. Title work had been done on the Juniper III project by GTC. (Gronner Dep. 44:14-20, 45:12-20.)

By February 13, 2009, the relationship between First American /GCT and Iberdrola had been in place for some time. (Robert Sargeant Dep. 35:23-36:2, Jan. 18, 2010.) On that day, Gronner

8 - FINDINGS AND RECOMMENDATION

stated in an internal email "[w]e need to use Gilliam County title because of agreements we have with the County including our property tax abatement agreement via the Strategic Investment Program (SIP). This is a sensitive issue locally with a fair amount of history associated with it." (Carla Scott Decl. Ex. I at 1, June 25, 2010.)

Nevertheless, on February 18, 2009, Iberdrola issued a request for proposal ("RFP") to AmeriTitle and First American for the title work on the Juniper II property, stating "It is Iberdrola Renewable's policy to procure title insurance services and products competitively for the benefit of reducing the cost of the title policy for our wind projects." (Kuhn Decl. Ex. L at 2; Ex. M at 1.)

The RFP did not advise the respondents that preference would be given to local contractors, nor did it ask the respondents to certify their principal place of business had been in Gilliam County for at least a year. (Kuhn Decl. Exs. L, M.) Iberdrola was aware GCT was the only title company with a title plant and its principal place in Gilliam County, and Iberdrola accepted First American's bid on the condition GCT would perform the work necessary to provide evidence of title and other work for First American. (Carla Scott Supp. Decl. Ex. G, Aug. 30, 2010.)

As of the date the RFP issued, GCT had completed approximately 90 percent of the title work on the Juniper II property. (Winslow Decl. ¶ 18.) Title reports had issued on all but one of the multiple properties encompassed by Juniper II. (Winslow Decl. ¶ 18.) The only work remaining was preparation of a report on the one remaining property and up dates on the properties for which reports had already issued. (Winslow Decl. ¶ 18.)

When Iberdrola issued the RFP, it did not tell Trummel how much title work was already completed on the Juniper II project and it was Trummel's understanding no title work had been done by GCT. (Trummel Dep. 77:22-78:5.) Although AmeriTitle had done title work for Iberdrola in the

9 - FINDINGS AND RECOMMENDATION

past, at the time that the RFP issued, AmeriTitle did not have an ongoing relationship with Iberdrola with respect to the Pebble Springs Farm/Leaning Juniper projects. (Trummel Dep. 106:17-24.) Nor did Iberdrola promise AmeriTitle that if it responded to the RFP, it would be awarded the title work. (Trummel Dep. 81:12-83:6.)

In late February 2009, both AmeriTitle and First American submitted proposals in response to Iberdrola's RFP seeking title work for Juniper II. (Kuhn Decl. Exs. N, O.) AmeriTitle proposed to use Stewart Title or First American as underwriters. (Kuhn Decl. Ex N at 2.) First American proposed itself as the underwriter. (Kuhn Decl. Ex. O at 1.) The parties dispute whether the cost of title insurance quoted by the two companies was the same, but agree that both AmeriTitle and First American were bound by Oregon Title Insurance Rating Organization ("OTIRO"), a state rate manual that sets rates based upon the amount of insurance issued. The parties also agree that companies bound by OTIRO cannot make themselves more competitive on the basis of pricing.

Prior to the Iberdrola RFP, neither Winslow nor Trummel had ever been asked to submit a bid or proposal for title work. (Winslow Decl. ¶ 27; Trummel Dep. 99:7-14.) Trummel testified that with past projects for Iberdrola, someone would call him or send him an email asking him to begin the work without asking for a price quote. (Trummel Dep. 99:15-24, 100:16-101:2.) Also, neither Winslow nor Trummel were ever asked to obtain a performance and payment bond or a surety bond. (Trummel Dep. 95:9-22, 97:22-99:6; Winslow Decl. ¶ 28.) Trummel understands a performance and payment bond is something that is utilized by contractors, that is, people who build or remodel things. (Trummel Dep. 97:2-10.)

On March 10, 2009, Iberdrola's Sargeant sent an email to Trummel, stating:

It looks like Iberdrola is going with First American and Gilliam County Title for the Leaning Juniper IIA and IIB projects.  The reason is the county's local participation requirement.  If AmeriTitle had an office in the county and would otherwise satisfy these requirements, the discussion may have been different.  While my client will not be able to work with you on this project, I encourage you to correct this situation so that you will be able to compete for future business.  And, if your company's situation should change in the immediate future, please let us know.

(Kuhn Decl. Ex. P.)

On March 19, 2009, Iberdrola accepted First American's proposal.  (Kuhn Decl. Ex. Q.)  At First American's direction, GCT continued to issue reports on Juniper II.  (Winslow Decl. ¶ 21.) According to Winslow, GCT updated the reports previously prepared and sent to Iberdrola and First American, and turned over the updated reports to First American.  (Winslow Decl. ¶ 21.)

If Iberdrola had awarded the work to AmeriTitle, AmeriTitle could not perform only the ten percent of work remaining on Juniper II; rather, it would require AmeriTitle to begin from scratch and disregard the title work GCT already completed on Juniper II.  (Winslow Decl. ¶ 22.)  Further, GCT would expect to be paid for the work already done.  (Winslow Decl. ¶ 22; Trummel Dep. 57:13-24.)

According to the County, Gronner testified Iberdrola uses local businesses where possible. Specifically, Gronner testified in his deposition:

Um, I will say that there's almost always . . . politically a desire to work locally where we can.  And we do anyway for the reason I already described, which is from a title standpoint, usually the most accurate records sit with the local agency.

Uh, secondly, we always want to, you know, support local businesses where we can throughout the development process, as we have to go to the, typically, county government, sometimes state government, but usually counties are involved regardless of the process . . . in approving our . . . proposed project.  And so we want . . . to be good tenants in the . . . local jurisdiction.

11 - FINDINGS AND RECOMMENDATION

. . . .

Look, these are small communities we're operating in; everybody knows everybody, there's a lot of -- word spreads quickly, . . . frankly, we pride ourselves on our community relations. And nothing, whether it's in a written agreement or otherwise, is going to have us look . . . outside if those services can be provided locally.

(Gronner Dep. 24:3-15, 126:3-9.) Gronner also testified, however, the County had complained to Iberdrola about Iberdrola using non-Gilliam County businesses prior to the Pebble Springs LLC SIP agreement. (Gronner Dep. 138:12-139:8.)

Although GCT's work on Pebble Springs Farm and Juniper II is complete, except for ongoing updates, and Pebble Springs Farm is in operation, title policies have not issued for either of these properties. (Winslow Decl. ¶ 24; Gronner Dep. 43:12-14.) GCT has, therefore, not yet been paid for its work on these properties. (Winslow Decl. ¶ 24.) GCT will be paid upon issuance of the policies. (Winslow Decl. ¶ 24.)

AmeriTitle has performed no work to date on Pebble Springs Farm, Juniper I or Juniper II, and at the time of his September 16, 2009 deposition, Trummel continued to have no idea of the extent of the title work remaining. (Trummel Dep. 76:5-80:16.). Similarly, at the time of his January 13, 2010 deposition, Gronner did not know what percentage of the title work had been completed by October 1, 2008, or by February 2009, the date the RFPs went out, or by March 2009, the date this lawsuit was filed. (Gronner Dep. 115:8-19.) Finally, at the time of his January 18, 2010 deposition, Sargeant did not know what percentage of the title search work and examination had been completed as of February 18, 2009, or how long GCT had been doing work for Iberdrola as of that date. (Sargeant Dep. 73:7-10, 75:7-16.)

12 - FINDINGS AND RECOMMENDATION

In fact, Iberdrola had the use of the reports prepared by GCT since 2005. (Winslow Decl. ¶ 25.) Any company attempting to create a wind project requires title reports long before it is ready to proceed with its project. (Winslow Decl. ¶ 25; Weimar Dep. 26:7-13.) The initial title research is far more intensive than for residential clients because there are thousands of acres and multiple landowners involved. (Winslow Dep. 35:3-15.) In fact, the title company must search all records regarding every single acre of property. (Winslow Dep. 25:15-18.) The reports are used to confirm ownership and encumbrances and leases in order to determine whether a project is feasible. (Winslow Decl. ¶ 25.) The reports are also used for surveying, for the placement of wind towers and other equipment, and to determine whether easements are required over neighboring properties. (Winslow Decl. ¶ 25; Winslow Dep. 37:7-12.)

Trummel is unaware whether anyone at the County had any information about Iberdrola and AmeriTitle having an ongoing title company relationship, nor does he have information suggesting the County wanted to intentionally deny title work to AmeriTitle. (Trummel Dep. 149:25-150:1.)

In December 2007, GCT began title work for Caithness Corporation ("Caithness") on the Shepherds Flat wind project located in Gilliam County and Morrow County. (Hollie Winslow Supp. Decl. ¶ 2, Sept. 16, 2010.) As of September 16, 2010, with the exception of periodic updates, 100 percent of the Caithness project located in Gilliam County is complete. (Winslow Supp. Decl. ¶ 3.) The latest SIP agreement entered into by the County was with Caithness Shepherd's Flat, LLC. This agreement was signed in April of 2009. (Patricia Shaw Decl.¶ 3, July 21, 2010; Carey Dep. 83:9-13.) The parties dispute whether the County Court is currently engaged in negotiations with Iberdrola or any wind company for a SIP agreement, or whether any company asked to speak with the County Court about a SIP agreement since April of 2009.

13 - FINDINGS AND RECOMMENDATION

While the County concedes Iberdrola has ongoing needs for title services for the Pebble Springs LLC Project (both Juniper II and Juniper III), it maintains those needs are nominal. For example, with respect to work remaining on Juniper II, the need is for updates of work already performed and, in the case of Juniper III, 95 percent of the title work was finished by July 2010. (Winslow Decl. ¶¶ 23, 26.) Performance of updates involves a search for new activity on the properties since the last report or update was issued and those searches require a minimal expenditure of time because of the previous title work completed on the properties. (Winslow Supp. Decl. ¶ 4.) If a wind company were to hire a new title company to perform updates, the new company would not have access to the work done to date by the first title company. Not only would it be unethical for a new company to use the work of a title company that previously worked on a project, but title companies do not rely upon the work of another title company because of the possibility of errors in the work done by the first company. (Winslow Supp. Decl. ¶ 7.) Thus, the title company hired to do the updates would have to repeat all of the work performed by the first title company. (Winslow Supp. Decl. ¶ 7.) In addition, the wind company would be required to pay both title companies for the same work. (Winslow Decl. ¶ 7.)

The parties agree that Caithness has substantial ongoing wind farm projects underway in Gilliam County. (Scott Suppl. Decl. Ex. F.) AmeriTitle claims those projects will require annual leases (and thus title services) over the next twenty years. The County challenges this assertion and contends, with the exception of periodic updates, GCT has completed all of the title work for the portion of the Caithness project located in Gilliam County, and there is no title work related to leases remaining. (Scott Suppl. Decl. Ex. F; Winslow Supp. Decl. ¶¶ 4, 5.) Finally, although the terms of leases are not public record, Winslow is familiar with the type of leases entered into between wind

companies and property owners and she is unaware of any one year leases between a wind company and property owner. (Winslow Supp. Decl. ¶ 7.) In fact, there is no incentive for a wind company to enter into such a lease, because the company needs to be assured the full use of the properties involved for many years. (Winslow Decl. ¶ 7.)

AmeriTitle insists the County will continue to apply its Local Business Policy in the future, whether or not it includes specific language in existing or future SIP agreements. According to AmeriTitle, a County representative stated that intention at a public hearing on April 23, 2009. (Scott Decl. Ex.. DD at 3.) However, the evidence relied upon by AmeriTitle for this assertion does not reveal the County's future intentions with regard to the Local Business Policy. Further, AmeriTitle maintains Paul Woodin, the County's wind farm consultant, testified during his deposition that the County has not retracted the Local Business Policy. (Paul Woodin Dep. 76:10-77:1, Nov. 24, 2009.). There is no reference by Woodin to the "Local Business Policy" in that testimony. Rather, Woodin was asked whether he had any reason to think the expectation that wind farm companies "select Gilliam County businesses that are available and competitive over non-Gilliam County Businesses" had changed. Woodin responded simply "No." (Woodin Dep. 76:18-77:1.)

AmeriTitle contends the County refused to authorize a tax abatement to a wind farm company known as Horizon because Horizon insisted on retaining discretion to hire competitive non-Gilliam County businesses. (Weimar Dep. 129:2-24; Scott Decl. Ex. DD at.3.) The County disputes AmeriTitle's characterization of the Horizon circumstances and contends the deal with Horizon fell through, at least in part, because Horizon determined the County's financial incentives were unacceptable. (Carey Dep. 38:25-40:1; Woodin Dep. 52:6-19.)

15 - FINDINGS AND RECOMMENDATION

Angie Shermer, Vice President of Marketing and Communications for AmeriTitle stated in her declaration that since 2008, AmeriTitle has made numerous efforts to obtain title work within the County, but its efforts have been unsuccessful. (Angie Shermer Decl. ¶¶ 3,4, Aug. 20, 2010.) AmeriTitle has performed title services for Iberdrola for all of its wind farm projects in all the counties where AmeriTitle does business except for those in Gilliam County. (Trummel Dep. 83:20-84:7; Shermer Decl. ¶ 5.)

At a public hearing on October 2, 2008, Carey and Judge Shaw discussed the Local Contractor Requirement with Winslow. When Winslow inquired how should we (GTC) "fall into" that category, Carey stated: "We intended that you be included in there." (Scott Suppl. Decl. Ex. Y at 7.) Winslow does not recall anyone telling her GCT was not a "contractor" within the meaning of the SIP agreement. (Winslow Dep. 127:13-24.)

According to AmeriTitle, it is not uncommon for title companies to be referred to as "contractors." As an example, it points to a single government services contract in which AmeriTitle is deemed a "contractor." (Chuck Sheffield Decl. ¶ 3, Aug. 30, 2010.) The County disagrees that title companies are commonly referred to as "contractors".

Shaw called Iberdrola to complain about the Cable Huston[6] demand letter, written on behalf of AmeriTitle. Shaw could not recall, however, whether she told anyone at Iberdrola the assumptions that the mandatory nature of the bidding requirement were mistaken. (Shaw Dep. 38:9-40:11.)

Iberdrola had used non-Gilliam County businesses for its projects in Gilliam County prior to negotiating the Pebble Springs LLC SIP agreement. Woodin, however, told Iberdrola (Gronner)

---

[6] Cable Huston is the law firm representing AmeriTitle.

that the use of local businesses "is a very strong expectation in Gilliam county."  (Gronner Dep. 138:12- 139:8; Scott Decl. Ex. S and T.)

Gronner agreed in his deposition that "in retaining a title company at the outset to assist you in ownership description and the like, you don't commit to who is going to get the work in that latter stage by the Real Property Group," and "that retention by a local title company by Iberdrola . . . wouldn't necessarily involve a commitment for more work."  (Gronner Dep. 27:1-5, 28:5-9.)

### Evidentiary Objections

As a preliminary matter, the court must consider AmeriTitle's objections to evidence submitted by the County on summary judgment.  Specifically, AmeriTitle seeks to strike  certain testimony from Winslow (owner of GTC) on the grounds the testimony is not based upon personal knowledge, lacks foundation and contains inadmissible hearsay.  For the reasons set forth below, Winslow's testimony is admissible and AmeriTitle's objections are denied.

I.      Legal Standard

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated and admissible under the Federal Rules of Evidence. *See* FED. R. CIV. P. 56(e).  Generally, a party filing a motion for summary judgment will support that motion with affidavits.[7]  Under Rule 56 of the Federal Rules of Civil Procedure, the affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED.

---

[7]While Rule 56 refers specifically to affidavits, a party may also offer unsworn declarations in support of a motion for summary judgment provided the declarations comply with the requirements of 28 U.S.C. § 1746.

17 - FINDINGS AND RECOMMENDATION

R. CIV. P 56(e)(1); *see also Bliesner v. The Communication Workers of America,* 464 F.3d 910, 915 (9th Cir. 2006) ("affidavits must be based on personal knowledge").

Federal Rule of Evidence 602 provides "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The evidence establishing personal knowledge of the matter may consist of the witness' own testimony. *Id.* Hearsay is defined as an out of court statement offered in evidence to prove the truth of the matter asserted. FED. R. EVID. 801. Hearsay is admissible only if it qualifies as an exception to the general hearsay rule.

II.  Analysis

AmeriTitle challenges the following paragraphs from Winslow's signed declaration because the statements are not based on personal knowledge, lack foundation and are inadmissible hearsay:

16.  As of October 1, 2008, GCT had issued 15 reports on the various properties incorporated in the project, and the title work on the project was approximately 75 percent complete.

17.  After October 1, 2008, GCT continued to issue reports on the LJ II [Juniper II] properties as requested by Iberdrola and First American.

18.  By February 18, 2009, GCT had performed approximately 90 percent of the title work on the LJ II property. Title reports had issued on all but one of the multiple properties encompassed in LJ II. The only work remaining was preparation of a report on the one remaining property and updates on the properties for which reports had already issued.

22.  Had Iberdrola awarded the work to another title company, that company could not simply have performed the approximately 10 percent of work remaining to be done; it would have had to begin from scratch the title work that GCT had already done. Iberdrola would have owed GCT for the work already completed by GCT.

18 - FINDINGS AND RECOMMENDATION

23.    By April 2009, GCT had completed the title work on LJ II, with the exception of periodic updates.

24.    Although GCT's work on Pebble Springs and LJ II is complete, except for periodic updates, title policies have not issued, and GCT has, therefore, not yet been paid for its work on these properties. GCT will be paid for this work when the title insurance policies issue.

26.    In September 2008, GCT began doing title work for Iberdrola on a project that it later learned was named Leaning Juniper III or Montague. GCT has completed approximately 95 percent of the title work on Montague.

Winslow stated in her declaration she worked for GCT since 1989 and purchased the company in 1998. (Winslow Decl. ¶ 1.) Winslow also stated she performed title searches and issued title reports both as an employee of GCT and as the owner. (Winslow Decl. ¶ 2.) Further, Winslow testified she was "familiar with the customary manner of payment in the title insurance business" and she was "familiar with the practices of title companies." (Winslow Decl. ¶ 8; Winslow Supp. Decl. ¶ 7.) Winslow explained GCT had performed all of the title work on Pebble Springs Farm, Leaning Juniper I, and Leaning Juniper II phases A and B. (Winslow Decl. ¶ 7.) Finally, under penalty of perjury, Winslow "declared" the statements in her declarations were based upon personal knowledge. (Winslow Decl. 1; Winslow Supp. Decl. 1.)

AmeriTitle contends Winslow testified she has *no* knowledge of the actual geographic scope of the Pebble Springs LLC Projects and the percentages of completed work were supplied to her by her attorney. (Winslow Dep. 131:1-132:2, 145:23-150:15.) A review of Winslow's testimony reveals, however, she determined the percentage figures by looking at the reports that issued, the dates of the reports, and legal description in the reports compared to the project area. Further she stated her understanding of the project area was based upon project maps supplied to her by Iberdrola

and the public records of the project area. (Winslow Dep. 131:13-131:22, 146:20-149:25.) Winslow is competent to testify as to the amount of work completed by her company on a given date.

An adequate foundation to show Winslow's first-hand knowledge of the operation of title companies, generally, and the work performed by GCT, specifically, has been established. *See, e.g., Sea-Land Service, Inc. V. Lozne Intern., LLC.*, 285 F.3d 808, 819 (9th Cir. 2002) (foundation and personal knowledge established through statement of familiarity with bills of lading and personal knowledge of all matters in declaration); *see also Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (personal knowledge requirement in Rule 56(e) can be met by inference).

Additionally, AmeriTitle argues "[t]o the extent Ms. Winslow is attesting to 'facts' based on what Iberdrola may have told her, her declaration amounts to nothing more than inadmissible hearsay." (Pl.'s Reply 5.) AmeriTitle does not direct the court to specific statements in Winslow's declaration that relied upon facts provided her by Iberdrola. Nor could the court find any indication in either of Winslow's two declarations or her deposition testimony that the statements set forth in her declarations relied in whole or in part upon statements made to her by Iberdrola. Consequently, the court declines to speculate which statements AmeriTitle is challenging as "inadmissible hearsay" or to develop AmeriTitle's theory of inadmissability. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 930 (9th Cir. 2003) (party's argument was waived because the party simply made a "bold assertion" of error, court will "review only issues which are argued specifically and distinctly"); *Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (assertion of error was "too undeveloped to be capable of assessment" and therefore waived), *aff'd*, 538 U.S. 721 (2003). AmeriTitle's request to strike portions of the Winslow declaration is denied.

*Legal Standard*

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All material facts are resolved in a light most favorable to the nonmoving party. *Id.* at 331. The court must accept all evidence and make all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*Discussion*

This case presents a number of complex legal issues, including challenges to federal subject matter jurisdiction and allegations the County violated the United States Constitution. Before turning to the analysis and resolution of those questions, however, it is necessary to consider the state legislation that provided the genesis for the present dispute. Specifically, the Oregon Enterprise Zone Act, OR. REV. STAT. §§ 285C.045 - 285C.255, and the Strategic Investment Program, OR. REV. STAT. §§ 285C.600 - 285C.626.

In 1985, the Oregon legislature enacted the Enterprise Zone Act to encourage businesses to locate in economically lagging areas. Eligible business firms that receive authorization from an enterprise zone sponsor and county assessor may apply for exemption from taxation of qualified property located in an area designated as an enterprise zone by the Economic and Community Development Department. OR. REV. STAT. § 285C.060. To receive the exemption, an eligible firm must meet minimum investment and hiring criteria. The standard exemption lasts three years, which may be extended two additional years in rural zones if the firm agrees with the zone sponsor to

satisfy additional compensation standards and certain local requirements. *Id*. at § 285C.173.

Currently, Oregon law provides for a 100 percent property tax exemption for qualifying property of a qualified business firm in a designated enterprise zone. *Id*. at §§ 285C.175(3)(a). The express purpose of the exemption is to "stimulate and protect the economic success" of certain "communities at the center of or outside major metropolitan areas for which geography may act as an economic hindrance." *Id*. at § 285C.055. The exemption is intended to encourage "development, growth and expansion of employment, business, industry and commerce" in certain economically depressed areas within Oregon by "attract[ing] private business investment into these areas and . . . help[ing] resident businesses to reinvest and grow." *Id.*

The Oregon Strategic Investment Program was enacted to "to improve employment in areas where eligible projects are to be located" and it urges benefitting firms to hire local employees "whenever practicable." OR. REV. STAT. § 285C.603. The Strategic Investment Program provides property tax exemptions for significant projects that will benefit Oregon's key industries. Properties developed under this program are exempted from local property taxes for up to 15 years on assessed value in excess of $100 million, or $25 million if the project is located in a rural area. *Id*. at § 285C.606 (1)(c). With local government approval, participating companies pay property taxes on the first $100 million in assessed value for the approved project. This base amount ($100 million) is increased by three percent per year. *Id*. at § 307.123. The local county's governing body must approve the exemption, and an annual fee of up to $2 million ($500,000 in rural areas) is imposed equal to 25 percent of the property taxes exempted. *Id*. at § 285C.609.

It is important to note AmeriTitle does not bring a challenge to the state's statutory scheme providing for the Oregon Enterprise Zone Act and the Strategic Investment Program. Rather, its

dispute focuses on the local application of the Strategic Investment Program by the County. Pursuant to the Oregon Strategic Investment Program, on October 1, 2008, the County and Pebble Springs LLC entered into a SIP agreement for the Pebble Springs Farm, Juniper II and Juniper III wind power projects. For purposes of the Strategic Investment Program statutory scheme, the three wind power projects covered by the SIP agreement were considered "a single 'eligible project.'" (First Am. Compl. Ex. A at 2.) At issue here is paragraph 4.h of the SIP agreement titled "Bidding Requirements." In relevant part, paragraph 4.h. states:

> For contractors selected subsequent to the execution of this agreement, Pebble Springs LLC shall invite contractors to participate in competitive bidding. When considering competitive bids, Pebble Springs LLC will give qualified local contractors preference of up to ten percent (10%) for contract values less than $250,000 and up to five percent (5%) for contract values $250,000 and higher. . . . A contractor shall be considered local if it certifies in its bid application that its principal place of business has been in Gilliam County for one year or longer from the date of the bid. . . . In the event County Commission feels a local contractor was not selected, but should have been, then IBERDROLA LLC and the county will meet to seek to resolve the issue.

(First Am. Compl. Ex. A at 6.)

By its motion for partial summary judgment, AmeriTitle seeks a declaratory ruling (Fourth Claim for Relief) that this Local Contractor Requirement in the Pebble Springs LLC SIP agreement is unenforceable both on its face and as applied and that the Local Business Policy is similarly unenforceable. AmeriTitle also requests judgment on the "improper means" element of its claim for intentional interference with economic relations (Third Claim for Relief). AmeriTitle contends the County employed an improper means by violating the Commerce Clause and the Equal Protection Clause and committing an *ultra vires* act.

Alternatively, the County requests summary judgment against all of AmeriTitle's claims. With respect to AmeriTitle's claims for declaratory relief, the County maintains this court lacks jurisdiction to grant the requested relief because those claims are either moot or not ripe. Additionally, the County contends AmeriTitle lacks the necessary standing for its declaratory relief claims. Finally, the County insists even if jurisdiction is appropriate, AmeriTitle's declaratory relief claims must fail on the merits. With respect to AmeriTitle's federal claims for damages, i.e., violations of the Equal Protection Clause and the Commerce Clause, the County again argues AmeriTitle lacks standing to bring those claims or, alternatively, those claims must fail on the merits. Lastly, with respect to AmeriTitle's claim for interference with economic relations, the County argues the court lacks discretion to hear the remaining state law claim and, in any event, that claim also fails on the merits.

As set forth below, the court must first consider whether AmeriTitle has standing to bring an action for declaratory relief and whether the claims alleged here are ripe. Only then may the court move to the merits of AmeriTitle's FAC to determine whether summary judgment is appropriate.

I.    <u>Request for Declaratory Relief (AmeriTitle's Fourth Claim for Relief)</u>

As set forth above, both parties seek an entry of judgment on AmeriTitle's Fourth Claim for Relief - a declaratory ruling the Local Contractor Requirement and an alleged Local Business Policy are unenforceable, facially and as applied. The County insists, however, the court lacks jurisdiction over AmeriTitle's request for a declaration the Local Contractor Clause is unenforceable because that claim is moot. Additionally, the County contends AmeriTitle lacks standing to seek a ruling the alleged Local Business Policy is unenforceable as a matter of law and, in any event, that claim is not ripe. The court must establish jurisdiction before proceeding to the merits of the case. *See*

*Northwest Airlines, Inc. V. Trans Workers*, 451 U.S. 77, 95 (1981) (Federal courts are "courts of limited jurisdiction that have not been vested with unlimited open-ended lawmaking powers.").

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  A party seeking relief under the Act must demonstrate constitutional standing under Article III[8] of the Constitution.  *Medimmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007).  Article III requires that courts decide only cases or controversies.  *Blanchette v. Connecticut General Ins. Corps.,* 419 U.S. 102, 138 (1974).  The Article III case or controversy requirement limits federal courts' subject matter jurisdiction by requiring, *inter alia*, that plaintiffs have standing and claims be "ripe" for adjudication.  *Allen v. Wright,* 468 U.S. 737, 750 (1984).

Standing addresses whether plaintiff is the proper party to bring the matter to the court for adjudication.  Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.1, at 57 (5th ed. 2007); *see also Allen,* 468 U.S. at 750-51.  The related doctrine of ripeness permits federal courts to dispose of matters that

---

[8]Article III states:

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;--between a State and Citizens of another State;--between Citizens of different States;--between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. Const. art. III, § 2

are premature for review because plaintiff's purported injury is too speculative and may never occur.

Chemerinsky, *supra,* § 2.4.1, at 117. Finally, the mootness doctrine authorizes a federal court to

decline to exercise jurisdiction if the court is unable to grant any effectual relief to the prevailing

party. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000); *see also Western Oil and Gas*

*Ass'n v. Sonoma County*, 905 F.2d 1287, 1290 (9th Cir. 1990) ("The ripeness inquiry asks 'whether

there is yet any need for the court to act,' while the mootness inquiry asks 'whether there is anything

left for the court to do.'" (quoting 13A Wright, Miller & Cooper, *Federal Practice and Procedure,*

§ 3532.1 (2d ed. 1984)). The party asserting federal subject matter jurisdiction bears the burden of

proving its existence. *See Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377 (1994).

    A.  Declaratory Relief and the Local Contractor Requirement

        1.    Mootness - Legal Standard

    The mootness doctrine requires an actual controversy exist at all stages of the litigation.

*Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1116 (9th Cir. 2003). Thus, "[a]n actual controversy

must be extant at all stages of review, not merely at the time the complaint is filed." *Bernhardt v.*

*County of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002); *see also Cook Inlet Treaty Tribes v.*

*Shalala*, 166 F.3d 986, 989 (9th Cir. 1999) ("The requisite personal interest that must exist at the

commencement of the litigation (standing) must continue throughout its existence (mootness).").

"Generally, an action is mooted when the issues presented are no longer live and therefore the parties

lack a legally cognizable interest for which the courts can grant a remedy." *Oregon Advocacy* Ctr.,

322 F.3d at 1116. If there is no longer any possibility that relief can be obtained for a claim, that

claim is moot and must be dismissed for lack of jurisdiction. *Foster v. Carson*, 347 F.3d 742, 745

(9th Cir. 2003.)

2.     Mootness - Analysis

In its Fourth Claim for Relief, AmeriTitle asks the court to declare the Local Contractor Requirement in the Pebble Springs LLC SIP agreement unenforceable, on its face and as applied, because the County exceeded its statutory authority by including such a requirement in the SIP agreement and it violates the Equal Protection Clause and Commerce Clause of the Constitution. (First Am. Compl. ¶ 58.)  The County contends AmeriTitle's request for declaratory relief fails to satisfy the Article III requirement for a live case or controversy and, as such, this court lacks jurisdiction over that claim.  Specifically, the County insists the title work for the Juniper II property was substantially completed prior to AmeriTitle filing its original Complaint in this case and, therefore, any declaration by this court could not result in AmeriTitle obtaining the work it sought by way of its response to Iberdrola's RFP.  Additionally, the County argues that whether it will enter future SIP agreements is speculative.  According to the County, it "is not currently engaged in negotiations with Iberdrola or any wind company for a SIP agreement, nor has any company asked to speak with the County court about a SIP agreement since April 2009."  (Defs.' Mem. Opp. Am. Summ. J. 15.)

The evidence in the record is undisputed that at the time AmeriTitle filed its original Complaint in this case, March 25, 2009, GCT had completed 90 percent of the title work on the Juniper II property covered by Iberdrola's RFP.  By the following month, GTC had completed all of the title work on the Juniper II property, with the exception of the periodic updates.  Similarly, except for periodic updates, the title work on the Pebble Springs Farm property was completed prior to the disputed SIP agreement, and the title work for Leaning Juniper III was substantially completed,

27 - FINDINGS AND RECOMMENDATION

i.e., at least 95 percent of the work, as of July 2010.  (Winslow Decl. ¶ 26; Summ. J. Hr'g Tr. 63:15-21, Oct. 5, 2010.)

A declaration by this court that the Local Contractor Requirement in the Pebble Springs LLC SIP agreement cannot prevent what has already transpired, nor can the court compel Iberdrola to award the Juniper II work to AmeriTitle, as the "winning" bidder, in response to the RFP.  *Cf. Tyler v. Cuomo*, 236 F.3d 1124 (9th Cir. 2000) (although challenged project was complete case was not moot because changes still could be made to alleviate adverse environmental effects); *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000) (NEPA action not moot even though Stage 1 of a highway interchange project was complete because court's "remedial powers would include remanding for additional environmental review and, conceivably, order the interchange closed or taken down []").  AmeriTitle has brought other causes of action seeking an award of damages to redress any alleged wrongdoing by the County with respect to the Pebble Springs LLC SIP agreement, but declaratory relief is unavailable at this juncture.

Nor does the "capable of repetition yet evading review exception" apply to preserve AmeriTitle's claim for declaratory relief against the Local Contractor Requirment.  This exception to the mootness doctrine applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."  *Davis v. FEC*, 554 U.S. 724, 735 (2008).  Without deciding the first prong of the test, it is clear AmeriTitle cannot satisfy the second prong.  First, the language for the Local Contractor Requirement in the Pebble Springs LLC SIP agreement is not binding on any future parties or agreements, and it has no applicability beyond the three properties (Pebble Springs Farm, Juniper II and Juniper III) identified in that agreement.

Further, it is undisputed that Iberdrola, not the County, drafted the language for the Local Contractor Requirement.  Nor is there any evidence in the record that any subsequent SIP agreements between the County and another wind farm company included the Local Contractor Requirement in dispute here.  In fact, at oral argument, Richard J. Kuhn, the County's attorney, stated unequivocally that while the County has entered into "a number of SIP contracts . . . . [n]one them contain any language anywhere like this." (Summ. J. Hr'g Tr. 42:3-5.)  Kuhn explained all of the other SIP agreements with the County "basically just have a line saying we encourage you to use local contractors or something to that effect." (Summ. J. Hr'g Tr. 42:13-16.)  Additionally, the County represented to the court that it has not entered into a SIP agreement since April of 2009, almost two years ago, and it is not engaged in negotiations with Iberdrola or any wind company for a SIP agreement.  (Defs.' Mem. Opp. Am. Summ. J. 15.)

Finally, at oral argument, when asked by the court whether "going forward" AmeriTitle is entitled to bid, Kuhn responded: "I don't think there are any bids.  But let's assume that I[berdrola], for example, says, okay, in 2015 we're going to build something.  I[berdrola] can now obviously call up and say AmeriTitle, hey, you've got a fully functioning title plant, we want you to do that work." (Summ. J. Hr'g Tr. 50:7-14.)  Kuhn also acknowledged:

> Gilliam County Title is now -- has a competitor, which is AmeriTitle, which as of August 2008 has a Gilliam County -- has a title plant in Gilliam County.  They can legally do title work in Gilliam County.
>  . . . .
> My view is their [sic] AmeriTitle, even if there is a clause -- even if there is a policy that we want to encourage local contractors to be selected, I think AmeriTitle can make the argument that they are now a local contractor.

(Summ. J. Hr'g Tr. 39:11-15, 40:15-21.)

29 - FINDINGS AND RECOMMENDATION

Based upon these representations by the County, it appears AmeriTitle is now a "local contractor" and, as such, cannot be denied an award of work under a future SIP agreement on that basis, even if that agreement included a version of the "Local Contractor Requirement" similar to the one set forth in the Pebble Springs LLC SIP agreement. AmeriTitle has the burden to show the likelihood of recurrence of an alleged injury and it has failed to carry that burden here. *See City Los Angeles v. Lyons*, 461 U.S. 95, 101-02, (1983) ("plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct"); *see also Sample v. Johnson*, 771 F.2d 1335, 1342-43 (9th Cir. 1985) (and cases cited therein). Accordingly, AmeriTitle's request for a declaratory ruling that the Local Contractor Requirement in the Pebble Springs SIP agreement is unenforceable, facially and as applied, should be dismissed as moot.

    B.    Declaratory Relief and the Local Business Policy

        1.    Standing/Ripeness - Legal Standard

In order to establish standing, under the Declaratory Judgment Act, AmeriTitle must show there "is a substantial controversy, between parties having adverse interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *accord MedImmune,* 549 U.S. at 127; *see also Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937) (stating that declaratory injunctive relief may be appropriate "[w]here there is ... a concrete case admitting of an immediate and definite determination of the legal rights of the parties in an adversary proceeding upon the facts alleged").

Under the circumstances of this case, the question whether the court has jurisdiction over AmeriTitle's request for declaratory relief may also be analyzed under the ripeness doctrine; namely,

whether the complained-of-conduct has an "immediate and substantial impact" on AmeriTitle such that, if the court were to withhold consideration, a hardship to AmeriTitle would result. *See Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 704 (1967). "[R]ipeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). The Supreme Court has developed a two-part test for determining the prudential component of ripeness in the administrative[9] context:  "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).  Here, the underlying inquiry, i.e., whether AmeriTitle will suffer an injury in fact (concrete and actual or imminent) if the court fails to act, is the same regardless of whether labeled standing, ripeness, or the requirement that the controversy have sufficient immediacy and reality. *See MedImmune*, 549 U.S. at 128 n.8 (explaining that the justiciability problem at issue could be described in terms of standing or ripeness and that "standing and ripeness boil down to the same question in this case"); *see also Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1139 (9th Cir. 2002) (*en banc*) ("[I]n measuring whether

---

[9]In *Principal Life Ins. Co. v. Robinson*, the Ninth Circuit determined the application of the *Abbott Labs* standard was inappropriate when determining whether a private party contract dispute was ripe for adjudication.  394 F.3d 665, 670-71 (9th Cir. 2005).  Rather, the court in *Principal Life* held the proper test for ripeness in private party contract disputes is "the traditional ripeness standard, namely, whether 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* at 671.  Regardless of whether the "Local Business Policy" was a result of an administrative action, the court will apply the *Abbott Labs* standard here for three reasons:  (1) the underlying policy reason applies; namely, that "judicial action should be restrained when other political branches have acted or will act", 394 F.3d at 670; (2) as a governing body for Gilliam County, the Board of Commissioners is charged with judicial, legislative *and* administrative duties; and (3) the dispute here is not ripe even under a traditional ripeness standard.

the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing (quotations and citation omitted)).

2.     Standing/Ripeness - Analysis

AmeriTitle is seeking "forward-looking"[10] relief by way of a declaration that the Local Business Policy violates the Equal Protection Clause and the Commerce Clause, on its face and as applied.  While the Supreme Court recently acknowledged there is no bright-line "between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not." *Medimmune, Inc.* 549 U.S. at 127, it is clear AmeriTitle must present some evidence that an injury is "certainly impending", i.e., that it will be prevented from competing for title work on an equal basis in Gilliam County.  *See Adarand Constructors, Inc. V. Pena*, 515 U.S. 200, 211 (1995) ("It is less clear, however, that the future use of subcontractor compensation clauses will cause Adarand 'imminent' injury.")  For AmeriTitle to maintain its claim for forward-looking relief, it must allege the application of the Local Business Policy in the future constitutes "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (footnote, citations, and internal quotation marks omitted).

AmeriTitle's claim that the County's Local Business Policy[11] denies it equal protection of the laws alleges an invasion of a legally protected interest in a manner that is "particularized" to

---

[10]To the extent AmeriTitle seeks a declaratory ruling that the Local Business Policy is unenforceable, based on the Local Contractor Requirement, referred to by AmeriTitle as an iteration of the Local Business Policy (First Am. Compl. ¶ 9), that claim is moot as set forth in Section I.A.2. above.

[11]The County denies the existence of a Local Business Policy.  For purposes of the jurisdictional analysis *only* the court will assume such a policy is in place.

AmeriTitle.  By alleging a denial of Equal Protection, AmeriTitle is not required to demonstrate it

has been, or will be, the low bidder on a RFP.  Rather, the injury in cases of this kind is that a

"discriminatory classification prevented the plaintiff from competing on an equal footing in its quest

for a benefit."  *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*,

508 U.S. 656, 667 (1993);[12] *accord Texas v. Lesage*, 528 U.S. 18, 21 (1999).  The injured party

"need not allege that [it] would have obtained the benefit but for the barrier in order to establish

standing."  *Id*. at 666.

More problematic for AmeriTitle, however, is whether an alleged future use of the Local

Business Policy will cause AmeriTitle "imminent" injury.  *Bras v. California Public Utilities Com'n*,

59 F.3d 869, 873 (9th Cir. 1995) ("Because plaintiffs seek declaratory and injunctive relief only,

there is a further requirement that they show a very significant possibility of future harm; it is

insufficient for them to demonstrate only a past injury."); *accord Mortensen v. County of

Sacramento,* 368 F.3d 1082 (9th Cir. 2004).  The Supreme Court requires that any alleged future

injury must be "*certainly impending*."  *Lujan*, 504 U.S. at 564 n.2 (emphasis in original) (citation

and quotations omitted); *accord Adarand Constructors, Inc.*, 515 U.S. at 211.  Thus, to support its

request for prospective relief, AmeriTitle must show that in the near future the County will enter into

a SIP agreement that mandates the contracting party hire only local title companies, and AmeriTitle

---

[12]In *Northeastern Florida*, an association of contractors challenged the city's program
setting aside 10% of all government contracts for businesses that were at least 51% women or
minority-owned.  508 U.S. at 658.  The Court held that to establish standing, a plaintiff need only
demonstrate that it is "able and ready" to bid on contracts and that a discriminatory policy
prevents it from doing so on an equal basis.  *Id*. at 666.  The Court found as sufficient for
standing the plaintiff's claim that its members "regularly bid on contracts in Jacksonville and
would bid on those that the city's ordinance makes unavailable to them."  *Id*. at 668.

would not qualify as a local company, thereby preventing it from competing with Gilliam Title on an equal basis. *See Adarand*, 515 U.S. at 211 ("We therefore must ask whether Adarand has made an adequate showing that sometime in the relatively near future it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors.")

Here, AmeriTitle contends there are a "substantial amount of ongoing wind farm projects underway in Gilliam County by Caithness" and "[t]hose projects will require annual leases (and thus substantial needs for title services) over the next twenty years." (Pl.'s Reply 5; Scott Supp. Decl. Ex. F.) AmeriTitle also cites to the deposition testimony of Woodin and Shaw as evidence there will be future SIP agreements between wind farm companies and the County. According to AmeriTitle, Woodin testified there were two, possibly three, wind farm companies that have expressed a desire to engage in negotiations for SIP agreements with Gilliam County after April 2009. AmeriTitle also contends Shaw testified in her deposition she was aware of a new project that Caithness had in early development; and she was aware of several wind companies that have been communicating with landowners in the County regarding new projects. Finally, at oral argument, counsel for AmeriTitle explained the significance of Woodin's deposition testimony: "Here we're hearing there are *potential* new wind farm companies having negotiations. We don't know if they've reached a SIP agreement yet but there's definitely a *possibility*." (Summ. J. Hr'g Tr. 26:17-21 (emphasis added.))

The court will first consider AmeriTitle's claim that the Caithness' Shepherds Flat Project provides the necessary standing to prevent future, imminent harm. The only evidence submitted by AmeriTitle to support this allegation is a single statement from an article titled *Wind Power Comes to Rural Oregon*, published on OregonBusiness.com in February 2010. The article states: "Private

34 - FINDINGS AND RECOMMENDATION

landowners involved are expected to see annual lease agreements of about $4,000 per turbine for the project's first 20 years." (Scott Supp. Decl. Ex. F at 1.) To establish standing for its declaratory relief claim, AmeriTitle must extrapolate from a lone statement in a news report that Caithness, the wind farm developer, will be issuing RFP's for the title work *and* that AmeriTitle will not be allowed to compete for that work as a result of Caithness's SIP agreement with the County.

The court is unpersuaded the news article is sufficient to confer jurisdiction. First, the SIP agreement between the County and Caithness was not submitted as evidence and, as such, the court is unable to discern the terms of Caithness' agreement with the County on the Shepherds Flat Project. At oral argument, Kuhn represented to the court there was no local contract provision in the Caithness SIP agreement with the County. (Summ. J. Hr'g Tr. 43:1-10.) In fact, AmeriTitle has not controverted the County's assertion that its SIP agreement with Caithness does not include a mandatory local business requirement. There is no evidence to show Caithness intends to solicit bids or RFPs for title work on the Shepherds Flat Project, or any other project in the foreseeable future. Nor is there evidence Caithness would be prevented from doing so as a result of the terms of its SIP agreement with the County. Nor does AmeriTitle dispute that most of the work on Caithness' Shepherds Flat project has been completed. Indeed, Winslow stated in her supplemental declaration: "There is no further title work related to leases to be done for the Caithness projects in Gilliam County." (Winslow Supp. Decl. ¶ 5.)

Finally, there is no evidence in the record that Caithness will in fact need annual title work on the Shepherds Flat Project; that it would acquire that work by way of a competitive bidding process; and, even if an RFP issued, that AmeriTitle would not be able to compete as a local contractor. Rather, Winslow testified that, although the terms of leases are not public record, she

is familiar with the type of leases entered into between wind companies and property owners and has never heard of a one year lease between a wind company and property owner. (Winslow Supp. Decl. ¶ 4.) Winslow explained there would be no incentive for a wind company to enter into such a lease, as the companies need to be assured of the use of the properties involved for many years. (Winslow Supp. Decl. ¶ 4.)

The court will next consider AmeriTitle's claim that the deposition testimony of Woodin and Shaw provide evidences of upcoming wind projects. (Pl.'s Mem. Summ. J. 33.) Specifically, Woodin stated in his deposition: "There are two new ones -- actually, there's three new ones coming up, but we haven't really gotten into discussion yet." (Woodin Dep. 76:15-17.) Shaw testified in her deposition: "I know there's several wind companies that have been talking to landowners, but I have not heard of any of them." (Shaw Dep. 171:3-5.) Additionally, Shaw testified there may be an additional project by Caithness requiring a new SIP agreement. (Shaw Dep. 170:1-24.)

The evidence relied upon by AmeriTitle to show the County will be entering into future SIP agreements is speculative. Although Woodin stated there were new projects on the horizon, there are no discussions underway. Additionally, he testified:

> The Witness: Well, I can say this much: one of them, they expressed a desire to do an expansion, but hasn't ever sat down and gave us any details.

> BY- MS. SCOTT: (Continuing)

> Q.    Is this a company that already has a SIP agreement with Gilliam County?

> A.    Yes, and it's very preliminary. They just said they've been acquiring additional land and plan to expand. The second one is a similar conversation.

> Q.    The second one is also an expansion of an existing developer with a SIP agreement?

> A    That's right. And the third one is totally undefined. It's rumored in the
> County that something is happening. I don't even know who they are.

(Woodin Dep. 80:12-81:1.)   Moreover, Shaw indicated in her deposition that no Caithness

representative had approached County Court to discuss a SIP agreement.  (Shaw Dep. 170:10-13.)

In fact the undisputed evidence shows the last new SIP agreement entered into by the County was

with Caithness Shepherds Flat, LLC in April of 2009.  (Shaw Decl. ¶ 3; Carey Dep. 83:9-13.)  The

County is not currently engaged in negotiations with Iberdrola or any wind company for a SIP

agreement, nor has any company asked to speak with the County Court about a SIP agreement since

April of 2009. (Shaw Decl. ¶ 3; Carey Dep. 83:9-13.)  *Cf. Adarand*, 515 U.S. at 211-12 (The Court

held the subcontractor had satisfied the requirement that "the alleged injury is not too speculative

for Article III purposes-that the injury is 'certainly impending'" because the record indicated that the

subcontractor would "very likely" bid on future contracts subject to the government's practice and

"often must compete for such contracts against small disadvantaged businesses." (quoting *Lujan*, 504

U.S. at 565 n.2)).

In sum, besides the Pebble Spring LLC SIP agreement, there are no other SIP agreements in

evidence.  There is no evidence of a Local Contractor Requirement in any of the subsequent SIP

agreements.  In fact, during oral argument Kuhn repeatedly stated: "There are a number of SIP

contracts out there.  None of them contain any language anywhere like this." (Summ. J. Hr'g Tr. 42:

3-5; *see also* 42:13-16 ("None of them contain any language about this.  All of them basically just

have a line saying we encourage you to use local contractors or something to that effect.")) There

is simply no evidence in the record there is any SIP agreement in negotiation or any bids or RFPs

that have issued  for title work.  Finally, based on the representations of Kuhn, AmeriTitle arguably

is now qualified as a local contractor and, thus, able to bid on equal footing. The fact that someone else may be harmed by the County's alleged Local Business Policy is not sufficient to confer standing. *See Allen*, 468 U.S. at 755 (Even if a government actor discriminates on the basis of race, only those personally denied equal treatment have standing to seek relief.)

Lastly, AmeriTitle contends "even if the County is not involved in any ongoing negotiations of SIP agreements with wind farm companies, the April 2009 audio recordings of the public meeting in which the County executed the Caithness SIP agreement shows that the County continues to enforce its Local Business Policy on wind farm companies who have existing SIP agreements with the County." (Pl.'s Mem. Supp. Summ. J. 33.) According to AmeriTitle, the County continues to enforce the Local Business Policy even absent specific language in a SIP agreement and injunctive relief is necessary to "redress the ongoing constitutional violations and allow AmeriTitle to fairly compete with Gilliam County Title to obtain title work for wind farm companies in Gilliam County." (Pl.'s Mem. Summ. J. 33-34.) Even assuming AmeriTitle can establish the County implemented and enforced a Local Business Policy, the law is clear that the mere existence of a policy or statute is not sufficient to confer standing. *See Scott v. Pasadena Unified School Dist.* 306 F.3d 646, 656 (9th Cir. 2002) ("The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." (quotations and citation omitted)).

The court finds AmeriTitle has failed to show an "actual or imminent" invasion and, therefore, is unable to establish standing for a declaratory ruling that the Local Business Policy is unenforceable, on its face and as applied. *See also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as

anticipated, or indeed may not occur at all." (Citations and internal quotations omitted)).

Accordingly, AmeriTitle's claim for declaratory relief against the Local Business Policy should be

dismissed for lack of standing.

AmeriTitle's claim for a declaratory ruling against the Local Contractor Requirement in the

Pebble Springs LLC SIP agreement is moot; and AmeriTitle lacks standing to bring a claim for

declaratory relief against the County's alleged Local Business Policy and/or that claim is not ripe.

Consequently, the County's request for an entry of judgment against AmeriTitle's Fourth Claim for

Relief should be granted.

II.     Constitutional Claims

AmeriTitle asserts two constitutional claims against the County and section 1983 supplies

the cause of action for these claims.  *See Gonzaga Univ. V. Doe*, 536 U.S. 273, 285-86 (2002).  To

sustain an action under section 1983, a plaintiff must show (1) the conduct complained of was

committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of

a federal constitutional or statutory right.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Wood v. Ostrander*,

879 F.2d 583, 587 (9th Cir. 1989).   Specifically, AmeriTitle alleges violations of the Equal

Protection Clause (First Claim for Relief) and the Commerce Clause (Second Claim for Relief)

resulting from an official County policy; namely the Local Business Policy, with the Local

Contractor Requirement in the Pebble Springs LLC SIP agreement being one manifestation of that

official policy.  AmeriTitle relies on the principles of municipality liability as set forth in *Monell v.*

*New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), to bring an action directly against the County for its section 1983 claims.[13]

In *Monell*, the Supreme Court considered the liability of municipal officials, sued in their official capacities, in a suit where plaintiffs sought damages based on the municipality's "official policy" of forcing pregnant employees to take unpaid leaves of absence. *Id*. at 661-62. The Court concluded municipalities and their officials were "persons" under section 1983 and set a standard for determining municipal liability:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

*Id*. at 690 (footnote omitted). While the facts of *Monell* unquestionably involved an official municipal policy as the moving force of the constitutional violations alleged, the Court determined section 1983 also authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id*. at 690-691.

In addition to establishing a decision attributable to the municipality, a section 1983 plaintiff must also

> demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997).

---

[13] A claim against Judge Shaw in her official capacity is a claim against the County under *Monell*.

The County seeks an entry of summary judgment against AmeriTitle's constitutional claims on a number of grounds. With respect to section 1983 liability, the County contends AmeriTitle is unable to show a deprivation of a constitutional right under either the Equal Protection Clause or the Commerce Clause. Additionally, the County contends Iberdrola, not the County, made the "hiring decision" and the County cannot be held liable for the actions of a private party, i.e., no action under color of state law. With respect to *Monell* liability, the County insists there is no Local Business Policy; and, in any event, AmeriTitle is unable to establish a causal link between the policy and the constitutional injury.[14]

A.     Alleged Constitutional Violations

AmeriTitle complains it was treated unfairly in comparison to local title companies within Gilliam County. Under either an Equal Protection Clause or Commerce Clause theory, AmeriTitle's underlying allegation is the same: The County's actions implementing the Local Business Policy/Local Contractor Requirement, requiring wind farm companies seeking tax abatement to favor local businesses, subjected AmeriTitle to discriminatory treatment without any economic justification or legitimate governmental purpose and violated the Constitution. While the underlying allegation is the same, the court will analyze AmeriTitle's Commerce Clause and Equal Protection claims separately. *See Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 881 (1985) ("Under

---

[14]As a threshold matter, the County contends AmeriTitle lacks standing to bring a claim for damages under section 1983 for violations of the Equal Protection Clause or the Commerce Clause. The court disagrees. Amerititle alleges an injury in fact, i.e., lost revenue, that is fairly traceable to the County's alleged Local Business Policy/Local Contractor Requirement of giving work to locals, and the alleged injury may be redressed by a decision in AmeriTitle's favor on the merits. Whether AmeriTitle ultimately is able to prove the existence of a Local Business Policy and a direct causal link between the alleged policy and an injury goes to the merits of its claims.

Commerce Clause analysis, the State's interest, if legitimate, is weighed against the burden the state law would impose on interstate commerce.  In the equal protection context, however, if the State's purpose is found to be legitimate, the state law stands as long as the burden it imposes is found to be rationally related to that purpose, a relationship that is not difficult to establish.").

1.      The Commerce Clause

AmeriTitle's Second Claim for Relief alleges the Local Business Policy, and the Local Contractor Requirement in the Pebble Springs LLC SIP agreement, penalize interstate commerce by requiring wind farm companies seeking tax abatement to favor local businesses without any economic justification or legitimate governmental purpose.  (First Am. Compl. ¶¶ 44-46.)  The Constitution empowers Congress "[t]o regulate Commerce . . . among the several states." U.S. Const. Art I, § 8, cl. 3.  The Supreme Court has interpreted this language to include a "negative" aspect that prevents state and local governments from unjustifiably discriminating against or impeding the free flow of goods from one state to another.  *See, e.g., Conservation Force, Inc. v. Manning*, 301 F.3d 985, 991 (9th Cir. 2002).  This principle is known as the "dormant Commerce Clause."  The dormant Commerce Clause limits the states' authority to regulate in areas in which Congress has not affirmatively acted.  *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 571 (1997).  If a state or local government enacts a law that unduly favors in-state commercial interests over their out-of-state[15] counterparts, that law "routinely" will be found invalid

---

[15]The analysis applies equally to differential treatment that benefits economic interests within a municipality and burdens economic interests outside that municipality.  *See Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources*, 504 U.S. 353, 361 (1992) ("[O]ur prior cases teach that a State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself."); *accord United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330, 370 (2007).

under the dormant Commerce Clause "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192-93 (1994).

Here, the court must consider the application of the dormant Commerce Clause to an alleged Local Business Policy, with the Local Contractor Requirement being one manifestation, whereby the County requires wind farms seeking tax abatement under a SIP agreement to prefer Gilliam County contractors. To evaluate whether a regulatory measures violates the dormant Commerce Clause, the court first must determine whether the law "'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.'" *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality*, 511 U.S. 93, 99 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). The Supreme Court explained in *Oregon Waste* the term "discrimination" means only different treatment for in-state and out-of-state economic interests. 511 U.S. at 99.

An ordinance that discriminates on its face against interstate commerce and in favor of local businesses is per se invalid, "save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone, Inc. V. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392 (1994). The Court in *Carbone* further explained that if an ordinance is not discriminatory on its face, a balancing test must then be performed to determine its constitutionality. *See id*. at 390. Under this less rigorous review, the ordinance will stand unless the burden it places upon interstate commerce is "clearly excessive in relation to the putative local benefits." *Id*. (quotations and citation omitted).

AmeriTitle, as the party challenging the Local Business Policy/Local Contractor Requirement, bears the initial burden of showing the alleged policy discriminates against interstate

commerce. *See Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). According to AmeriTitle, the Local

Business Policy requires wind farm companies to hire Gilliam County businesses to be eligible for

a SIP agreement providing for tax abatement. Similarly, the Local Contractor Requirement expressly

provided that Iberdrola "will give qualified local contractors preference . . . ." (First Am. Compl.

Ex. A at 6.) Thus, as it is alleged by AmeriTitle, the Local Business Policy and the Local Contractor

Requirement are facially discriminatory because the preference for local business/contractors is

expressly set forth and provides local businesses a competitive advantage over non-local entities.

The County contends neither the Local Business Policy nor the Local Contractor Clause

violate the Commerce Clause.[16] With respect to the Local Business Policy, the County argues simply

no such policy[17] exists and, therefore, cannot provide a basis for a Commerce Clause violation. With

---

[16]The County also contends Iberdrola made the decision to hire GCT and it would have
done so regardless of the Pebble Springs LLC SIP agreement. Consequently, Iberdrola was not
acting under the color of state law when it awarded the RFP to GCT and the County may not be
held liable for the actions of a private party. (Defs.' Mem. Opp. Summ. J. 25-26.) There can be
no doubt the alleged Local Business Policy and the Local Contractor Requirement in the Pebble
Springs LLC SIP agreement resulted from conduct by the County and, thus, implicates state
action. *See Brentwood Academy v. Tennessee Secondary School*, 531 U.S. 288, 295 (2001)
(Courts are obligated "to assure constitutional standards are invoked 'when it can be said that the
state is *responsible* for the specific conduct of which the plaintiff complains.'" (quoting *Blum v.
Yaretsky*, 457 U.S. 991, 1004 (1982))). Whether Iberdrola would have hired GCT in any event is
an issue of causation for the jury to decide.

[17]In order to establish an official policy or custom sufficient for *Monell* liability, a
plaintiff must show a constitutional right violation resulting from (1) an employee acting
pursuant to an expressly adopted official policy; (2) an employee acting pursuant to a
longstanding practice or custom; or (3) an employee acting as a "final policymaker." *Webb v.
Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

Here, AmeriTitle alleged :

Since the fall of 2007, Defendants Judge Patricia Shaw and Gilliam County have
established and enforced an official custom, practice and policy (the "Local
Business Policy") requiring wind farm companies who want tax abatement

respect to the Local Contractor Clause, the County argues the preference language is discretionary, i.e., "may accept" rather than "must accept." Additionally, the County explains there is no penalty for failing to hire a local contractor or business. Instead, a mandatory meeting is convened to resolve the issue. As such, the County maintains the Pebble Springs LLC SIP agreement, with its consequent tax abatement, is not conditioned upon local hiring. Finally, the County insists the Local Contractor Requirement does not apply to title companies and there is no evidence of causation, i.e., Iberdrola would have hired AmeriTitle *but for* the Local Contractor Requirement.

The County's arguments are unpersuasive on summary judgment. AmeriTitle has presented evidence that the Local Contractor Requirement in the Pebble Springs LLC SIP agreement sets forth a preference for local contractors. Indeed, that provision states, in part: "For contractors selected subsequent to the execution of this agreement, Pebble Springs LLC *shall* invite contractors to participate in competitive bidding. When considering competitive bids, Pebble Springs LLC *will give qualified local contractors preference*. . . ." (First Am. Compl. Ex. at 6 (emphasis added).) Nor does the "may accept" language relied upon by the County negate this express preferential language. Additionally, the Local Contractor Requirement grants the County oversight, i.e., the right to intervene if a local contractor is not selected. (First Am. Compl. Ex. at 6 ("In the event the County Commission feels a local contractor was not selected, but should have been, then IBERDROLA LLC and the County will meet to seek to resolve the issue.").) Such authority belies the County's argument this provision was discretionary in nature.

---

through a Strategic Investment Program agreement )a "SIP Agreement") to favor Gilliam County businesses over similarly situated non-Gilliam County businesses.

(First Am. Compl. ¶ 2.)

Similarly, AmeriTitle has presented some evidence the County requires wind companies seeking a SIP agreement with the County to use local businesses. (Pl.'s Reply 10-15 (and citations to the record therein).) For example, at a Gilliam County public hearing in November 2007, Shaw described Gilliam County's Strategic Investment Program requirements:

> One of them is filing on the SIP program is that they must hire locally if that's – it's available. And there will be consequences in the SIP agreement that – if they don't there will be tax consequences. They'll lose it or whatever. There's going to be – it's going to be tight and tough.

(Scott Decl. Ex. N at 3.) Thus, AmeriTitle has presented some evidence of a Local Business Policy that, on its face, favors local interests over the non-local concerns.

Further, the court is unable to determine on the record before it a purpose for the Local Business Policy/Local Contractor Requirement. In a footnote, the County argues simply:

> Because the agreement does not amount to economic protectionism, plaintiff's arguments regarding the "purpose" for the clause are irrelevant . . . . Further, the County did not refuse to proffer any purpose for the local contractor provision. It, instead, stated that the language originated with Iberdrola . . . . Despite plaintiff's arguments to the contrary, that Iberdrola chose the language is significant as it demonstrates that the specifics came from Iberdrola.

(Defs.' Mem. Opp. Summ. J. 32 n.13.) The parties do not dispute that the specific language of the Local Contractor Requirement was included at the request of Gronner, Iberdrola's Director of Business Development, who negotiated the Pebble Springs LLC SIP agreement on behalf of Iberdrola. (Shaw Dep. 26:23-25; Kuhn Decl. Ex. I, J, K; Wilford K. Carey Dep. 38:19-24.) There is also evidence, however, the language for the Local Contractor Requirement in the Pebble Springs LLC SIP agreement resulted from Iberdrola's attempt to protect itself from the County's policy requiring the use of local businesses.

Q.      So when he answered, quote, "I believe that's true," unquote, to the question, "Didn't Iberdrola put that – suggest that language as a way to protect itself from Gilliam County's policy requiring them to use Gilliam County businesses over non-Gilliam County businesses, " that's your understanding, too?

. . . .

A.      Yes, I – the – the reason that we suggested that language, as the question put it, is that we understood the desire for the County to have, uh, an incentive or go so far to say a requirement to use local content as available, that we wanted to ensure that we could comply and that it was specific enough so that we knew if we were or weren't complying as this agreement was of value to us.

(Gronner Dep. 51:5-19.)

The burden is on the County to show the Local Business Policy, including the Local Contractor Requirement, is supported by a legitimate local purpose and there are no reasonable nondiscriminatory alternatives adequate to serve that purpose. *See Hughes*, 441 U.S. at 336.  In addition, the law is well-established that the local purpose must be unrelated to economic protectionism. *See, e.g., Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992).  The record before the court is incomplete for such a determination.

As explained above, the County denies the existence of the Local Business Policy and insists the language of the Local Contractor Requirement is Iberdrola's alone.  It is clear, however, that when a government acts to favor local economic interests over non-local interests such a regulation is often struck down as violating the Commerce Clause because economic protectionism is not a legitimate local purpose. *See, e.g., Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,* 504 U.S. 353 (1992) (Impermissible to prohibit private landfill owners from taking in solid waste generated outside of the county); *Dean Milk Co. v. Madison*, 340 U.S. 349 (1951) (local political subdivision may not prohibit the sale of milk as pasteurized by requiring pasteurization

47 - FINDINGS AND RECOMMENDATION

within five miles of the city's square); *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) (Impermissible to prohibit private landfill owners from taking solid waste generated outside of the state); *see also Maine v. Taylor*, 477 U.S. 131 (1986) (ban did not violate the commerce clause in that it served legitimate local purpose, i.e., protecting native fisheries from parasitic infection and adulteration by non-native species, that could not be served as well by available nondiscriminatory means). In the absence of *any* evidence of a legitimate purpose, the court is unable to make a determination, as a matter of law, whether the County had a legitimate purpose.

To avoid summary judgment AmeriTitle is not required to prove every element of its Commerce Clause claim against the County. Rather, it need only establish material issues are in dispute. Here, AmeriTitle has alleged a claim for a Commerce Clause violation grounded in an official County policy requiring wind farms to give a preference to local business. Whether that policy exists and the contours of the policy are factual questions that must be resolved in AmeriTitle's favor to attach municipal liability. *See Webb*, 330 F.3d at 1164 ("Plaintiff must prove the existence of a longstanding practice or policy to the satisfaction of the factfinder.") For example, when was the alleged Local Business Policy initiated; what are the precise terms of the alleged Local Business Policy; are title companies covered as contractors; is the local preference a requirement or discretionary; and does/will the County enforce the local preference? Additionally, the issue of causation – was AmeriTitle passed over for the Juniper II RFP and other wind farm work solely because of the Local Business Policy/Local Contractor Requirement – as well as an amount of damages, is for a jury to decide. *See Board of County Com'rs of Bryan County*, 520 U.S. at 404 (section 1983 plaintiff must also show the municipal action was taken with the requisite degree of culpability, and must demonstrate a direct causal link between the municipal action and the

deprivation of federal rights).  Accordingly, the County's request for summary judgment against AmeriTitle's section 1983 claim for a violation of the Commerce Clause should be denied.

        2.      The Equal Protection Clause

AmeriTitle's First Claim for Relief alleges the Local Business Policy, and the Local Contractor Requirement in the Pebble Springs LLC SIP agreement, violate the Equal Protection Clause because it requires wind farm companies seeking tax abatement to favor local businesses without any economic justification or legitimate governmental purpose.  (First Am. Compl. ¶¶ 36-38.)  The Equal Protection Clause prohibits a state from denying "any person within its jurisdiction the equal protection of the laws." US Const, Amend XIV.  "The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

In analyzing an Equal Protection challenge, the court must determine the appropriate level of scrutiny to be applied.  If the statute regulates certain "fundamental rights" or distinguishes between people on the basis of certain "suspect characteristics" the statute is subject to "strict scrutiny" and, thus, the regulation must serve a compelling state purpose and be narrowly tailored to achieving that purpose. *See Zablocki v. Redhail*, 434 U.S. 374, 388 (1978).  Other classifications, such as gender and illegitimacy, are less "suspect" and, therefore, subject only to intermediate scrutiny.  In those instances, the regulation need only serve an "important" state interest and the means employed need only be "substantially related" to that interest. *See J.E.B. v. Alabama*, 511 U.S. 127, 136 (1994); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982).  All other regulations are subject to "rational basis" review, requiring only that the regulation bear some rational relation to a legitimate state interest. *See Romer v. Evans*, 517 U.S. 620, 632 (1996).

AmeriTitle contends "[f]or the same reasons that the Local Business Policy and the Local Contractor Requirement violate the Commerce Clause, they also violate the Fourteenth Amendment's guarantee of equal protection." (Pl.'s Mem. Summ. J. 29.)  According to AmeriTitle, the impermissible discrimination is the classification of businesses based on residency; the Local Business Policy/Local Contractor Requirement mandates different treatment for similarly situated businesses.  AmeriTitle acknowledges that rational basis scrutiny applies here, but argues the County is unable to identify any legitimate governmental purpose for the Local Business Policy or the Local Contractor Requirement.  *See, e.g., Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008) ("mere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classification survives rational basis review"); *Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002).

Conversely, the County once again asserts the Local Contractor Requirement does not mandate local hiring, is not enforceable and does not have a consequence if breached; accordingly, "there are no enforceable classifications to be compared for equal protection purposes."  (Defs.' Mem. Opp. Summ. J. 33-34.)  Additionally, the County insists the Local Business Policy/Local Contractor Requirement do not apply to title companies and, in any event, AmeriTitle cannot establish causation, i.e., Iberdrola would have hired AmeriTitle in the absence of such a requirement.

Alternatively, the County argues even if there is a classification applicable to AmeriTitle, under a rational basis review, its Equal Protection challenge must fail because "[e]ncouraging businesses to locate in the County is just such a rational basis."  (Defs' Mem. Opp. Summ. J. 35.) The County relies on the decision in *Associated General Contractors of California, Inc. v. City and*

*County of San Francisco,* 813 F.2d 922 (9th Cir. 1987), to support its argument there is a rational

basis for the Local Business Policy/Local Contractor Requirement.

In *Associated General Contractors*, the court held an ordinance granting a 5-percent bidding

preference to locally-owned-business enterprises did not violate the Equal Protection Clause. First,

the court noted the ordinance affected only the expenditure of public funds and a city may rationally

allocate its own funds to ameliorate disadvantages suffered by local business, particularly where the

city itself creates some of the disadvantages. 813 F.2d at 943. In addition, the court stated the

"preference is not a burden imposed discriminatorily . . . on nonresident corporations solely because

they are nonresidents . . . it is an attempt to remove or lighten a burden San Francisco businesses

must bear that is not shared by others." *Id.* (internal citation and quotations omitted).

Significantly, two of the ordinance's findings involved legitimate considerations. The first

finding was that local businesses were at a competitive disadvantage with businesses from other

areas because of the higher administrative costs of doing business in the city. *Id.* The second finding

was the public interest would best be served by encouraging businesses to locate and remain in the

city. *Id.* ("[I]t is generally legitimate for a governmental entity to encourage businesses to move into

the jurisdiction.") Finally, the court determined the means adopted to pursue the legitimate ends were

both measured and appropriate.

> The preferences given local businesses are relatively slight. LBEs get only a 5
> percent bidding preference; there are no goals, quotas or set-asides. Moreover, the
> preference does not apply to all business transactions conducted within the
> jurisdiction, only those where the city itself is a party. Finally, the definition of LBE
> is rather broad; foreign businesses can become LBEs by acquiring "fixed offices or
> distribution points" within the city and paying their permit and license fees from a
> San Francisco business address. Thus, any business willing to share some of the
> burdens of a San Francisco location-higher rents, wages, insurance premiums, etc.-
> can enjoy the benefits of the LBE preference. We see no constitutional infirmity in

the city's modest attempt to support local businesses and to induce other businesses to move there.

*Id.* at 943-44 (footnote omitted).

In this court's view, the Ninth Circuit's reasoning in *Associated General Contractors*, militates against finding the County had a legitimate purpose for the Local Business Policy/Local Contractor Requirement. In fact, none of the factors relied upon by the court to validate the preference in *Associate General Contractors* are present here. This case does not involve the expenditure of public funds directly in the contracting for the wind farm work. Rather, private businesses are required to incur the cost of the local preference. Nor is there evidence here of any disadvantages, i.e., higher rents or burdensome regulations, suffered by local Gilliam County businesses such that a local preference is needed to level the opportunity. The evidence in the record shows the Local Business Policy/Local Contractor Requirement is imposed simply to reward and support local business. There is a 10% preference on contracts up to $250,000 that applies to all contractors; and there is evidence the term "contractor" is construed so broadly as to include title companies whose rates are set by state law.

Finally, the record is devoid of any findings by the County to support its decision to support local business at the expense of non-local entities, or that the Local Business Policy would induce companies to locate within Gilliam County. In fact, to be a local business in *Associated General Contractors*, the business must simply have an office or distribution point within the boundaries of San Francisco and pay the permitting and licensing fee. *See* 813 F.2d at 943 n.44. Here, to qualify as a local business under the County's requirement, the business must have its principal place of business in Gilliam County for at least one year from the date of the bid. This would require any

new company locating to the County to wait on the sidelines for at least one year before becoming eligible for work with wind farm companies operating under a SIP agreement. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589-91 (9th Cir. 2008) (court need not accept defendants' characterization of what classification if it could not reasonably be viewed to further the asserted purpose); *Lockary v. Kayfetz*, 917 F.2d 1150, 1155-56 (9th Cir.1990) (homeowners challenging a city's moratorium on new water hookups, which the city claimed was needed due to a water shortage, survived summary judgment by introducing evidence there was no water shortage); *Parks v. Watson*, 716 F.2d 646, 654-55 (9th Cir.1983) (developer claimed a city violated its Equal Protection rights when it required developer to relinquish a well before building and court found factual disputes as to whether the developer failed to submit drawings and whether there was actually a concern over access, and found that a bare desire to take the developer's wells was not a legitimate interest); *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 993 (9th Cir. 2007) ("in an equal protection claim based on selective enforcement of the law, a plaintiff can show that a defendant's alleged rational basis for his acts is a pretext for an impermissible motive"), *aff'd*, 553 U.S. 591 (2008).

The court finds AmeriTitle has shown a classification based upon the Local Business Policy/Local Contractor Requirement. In response, the County argued only that the legitimate state interest was "[e]ncouraging businesses to locate in the County. . . ." (Defs.' Mem. Opp. Summ. J. 35.) The record, however, is devoid of *any* evidence to support this purported legitimate reason for the challenged classification. Further, the means employed – one year waiting period – appears inconsistent with the stated purpose to attract new business. Even accepting the County's stated purpose for the alleged regulation, under the Ninth Circuit's reasoning in *Associated General Contractors*, the County is unable to satisfy even a rational basis scrutiny of its actions.

53 - FINDINGS AND RECOMMENDATION

It is important to note, however, that AmeriTitle has simply survived summary judgment. As with AmeriTitle's Commerce Clause challenge, there are disputed material issues remaining in order for AmeriTitle to establish a violation of the Equal Protection Clause based upon municipal liability (*Monell*). Indeed, the same material facts are required for AmeriTitle to establish municipal liability for its Equal Protection challenge. As set forth above, AmeriTitle must prove the Local Business Policy exists and the contours of that policy. *See Webb*, 330 F.3d at 1164 ("Plaintiff must prove the existence of a longstanding practice or policy to the satisfaction of the factfinder."). Once again, the issue of causation – was AmeriTitle passed over for the Juniper II RFP and other wind farm work solely because of the Local Business Policy/Local Contractor Requirement – as well as an amount of damages, is for a jury to decide. *See Board of County Com'rs of Bryan County*, 520 U.S. at 404 (section 1983 plaintiff must also show the municipal action was taken with the requisite degree of culpability, and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights). Accordingly, the County's request for summary judgment against AmeriTitle's section 1983 claim for a violation of the Equal Protection Clause should be denied.[18]

III.    State Claim for Interference with Economic Relations

AmeriTitle also alleges a common law tort claim for intentional interference with economic relations against the County (Third Claim for Relief). The elements of an intentional interference with economic relations and prospective economic advantage claim are: (1) the existence of a

---

[18]AmeriTitle argues "for the same reasons that Gilliam County violated the Commerce and Equal Protection Clauses by including the Local Contractor Requirement in the Pebble Springs SIP agreement, Gilliam County exceeded its authority under the [Oregon Enterprise Zone] Act." (Pl.'s Mem. Summ. J. 34-35.) *See* OAR 123-023-1300((3)(a) ("Such means shall not create any: Explicit bias against anyone's rights or access to the privilege of employment, such as specifying residency-based hiring criteria . . . ."). For the reasons stated above, the court finds there are questions of fact whether the County exceeded its statutory authority.

professional or business relationship (which could include, e.g., a contract or a prospective economic advantage); (2) intentional interference with that relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages. *Allen v. Hall*, 328 Or. 276, 281, 974 P.2d 199 (1999).

AmeriTitle requests an entry of judgment on the "improper means" element of this claim grounded in the application of the Local Business Policy and the inclusion of the Local Contractor Requirement in the Pebble Springs LLC SIP agreement. As set forth above, there are material questions of fact whether the County violated AmeriTitle's constitutional rights.[19] As such, AmeriTitle has failed to establish the improper means elements as a matter of law and its request for judgment on this element should be denied.

Conversely, the County contends it is entitled to summary judgment on the economic interference claim because AmeriTitle is unable to satisfy *any* of the elements of this claim as a matter of law. Turning initially to the last two elements of the claim for intentional interference with economic relations – causal effect and damages – as set forth above, there are disputed material issues on each of these elements that prevent summary judgment.

Similarly with respect to the first and third elements – a prospective economic advantage and by a third party – viewing the evidence in the light most favorable to AmeriTitle, there are questions that must be resolved by a fact-finder. Clearly, the County would be a third party by way of any contract between AmeriTitle and a wind farm company, and AmeriTitle presented some evidence

---

[19]AmeriTitle also alleges the County employed an improper means because it exceeded its statutory authority. AmeriTitle has not established, as a matter of law, the County exceeded its statutory authority and, accordingly, summary judgment is not appropriate on that basis.

of a prospective business opportunity with Iberdrola.  AmeriTitle also alleges in its FAC it had "prospective economic business opportunities with other wind farm companies, including but not limited to Caithness, in Gilliam County."  (First. Am. Compl. ¶ 49.)  Simply put, AmeriTitle maintains the County's conduct in requiring preferential treatment for local businesses interfered with its ability to compete for title work on wind farm projects.  There is some evidence in the record that this requirement by the County may have influenced the award of title work by wind farm development companies.  Such evidence is sufficient to survive summary judgment on the element of prospective economic advantage.  *See Fox v. County Mut. Ins. Co.*, 169 Or. App. 54, 72, 7 P.3d 677 (2000) ("a third party's interference may be actionable 'even though the arrangement interfered with does not rise to the dignity of a contract.'" (quoting *Luisi v. Bank of Commerce*, 252 Or. 271, 275, 449 P.2d 441 (1969)); *see, also, Aylett v. Universal Frozen Foods Co.*, 124 Or. App. 146, 861 P.2d 375 (1993) (potato growers could bring action for intentional interference with their relationship with a prospective buyer); *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995) (describing the tort of intentional interference with economic relations as protecting a "prospective economic advantage").

Finally, with respect to the remaining two elements – intentional interference and accomplished through an improper means – Oregon law requires "if liability in tort is based on an actor's means, then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession."  *Northwest Natural Cas Co. V. Chase Gardens, Inc.*, 328 Or. 487, 498, 982 P.2d 1117 (1999).  As set forth above, there are disputed material issues that must be resolved to determine whether the County violated the law by way of a Local Business Policy and the Local

Contractor Requirement in the Pebble Springs LLC SIP agreement.  If AmeriTitle is able to prevail at trial and establish a violation of either the Commerce Clause or Equal Protection Clause, that violation may satisfy the improper means element of this claim.  *See Top Service Body Shop, Inc. v. Allstate Ins.*, 283 Or. 201, 209-210, 582 P.2d 1365 (1978) ("such a claim is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself").  Further, a jury could infer the County, through its purposeful conduct in promulgating a requirement that wind farm companies use only local businesses, knew and intended non-local entities, such as AmeriTitle, would not be able to compete on an equal basis.

AmeriTitle has presented some evidence of the essential elements of its claim for intentional interference with economic relationship – wrongful interference by a third party that caused damage. Accordingly, the County's request for summary judgment against AmeriTitle's claim for intentional interference with economic relations should be denied.

### Recommendation

Based on the foregoing, AmeriTitle's Amended Motion for Partial Summary Judgment (doc. #71) should be DENIED; and the County's Amended Motion for Summary Judgment Pursuant to FED. R. CIV. P. 56 (doc. #83) should be GRANTED, in part, and DENIED, in part, as follows: judgment should be entered against AmeriTitle's Fourth Claim for Relief.  AmeriTitle's evidentiary objections are DENIED.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due **May 13, 2011**.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

57 - FINDINGS AND RECOMMENDATION

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 26th day of April, 2011.


/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge